UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| OCEAN M. LILLARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17 CV 83 CDP |
| | ) | |
| NANCY A. BERRYHILL, Deputy | ) | |
| Commissioner of Operations for | ) | |
| Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Ocean M. Lillard seeks judicial review of the Commissioner's

adverse decision denying his application for supplemental security income.[2]

For the reasons that follow, the decision is reversed and this case is remanded to

the Commissioner with instructions to award benefits.

### Procedural History

On December 15, 2010, Dusty Black filed an application for supplemental

security income (SSI) on behalf of her then-minor child, Ocean M. Lillard, alleging

that Lillard became disabled on November 17, 2010, because of attention deficit

hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), depression,

---

[1] Nancy A. Berryhill's term as Acting Commissioner of Social Security expired in November 2017. She continues to lead the agency as Deputy Commissioner of Operations.

[2] Lillard was born female but identifies as male. In this Memorandum and Order, I will refer to Lillard using masculine pronouns, although portions of the administrative transcript do not.

anxiety, and emotional disturbance. (Tr. 88-85, 114.) The Social Security Administration denied the claim for benefits on February 4, 2011. (Tr. 32-35.) Upon Black's request, a hearing was held before an administrative law judge (ALJ) on June 13, 2013, at which Black and Lillard testified. (Tr. 596-663.) On August 29, 2013, the ALJ issued a decision finding Lillard not disabled. (Tr. 10-27.) After the Appeals Council denied Black's request for review of the ALJ's decision (Tr. 5-8), Black filed a civil action in this Court seeking judicial review. *Black o/b/o O.L. v. Colvin*, Case No. 2:14CV95 DDN (E.D. Mo. 2014). On August 24, 2015, United States Magistrate Judge David D. Noce remanded the matter to the Commissioner for further proceedings, finding that the Commissioner's final decision was not supported by substantial evidence on the record as a whole and was not consistent with the Regulations and applicable law. (*See* Tr. 692-712.)

Upon receipt of Judge Noce's Order, the Appeals Council vacated the Commissioner's earlier decision and remanded the case to an ALJ for further proceedings consistent with the Order.[3] The ALJ held supplemental hearings on February 7 and February 10, 2017, at which Black, Lillard, and vocational and medical experts testified. (Tr. 1399-1452, 1453-1510.) On August 3, 2017, the ALJ issued a decision finding that Lillard was not disabled. (Tr. 667-90.) Appeals Council review of the decision was not sought, and the record contains no notice

---

[3] Upon the Appeals Council's remand, the matter was assigned to and heard by the same ALJ who heard and determined the matter initially.

that the Appeals Council conducted its own review.  Accordingly, the ALJ's

decision of August 3, 2017, became the Commissioner's final decision sixty-one

days after its issuance.  (*See* Tr. 665.)

On June 22, 2016, while the case was pending before the Commissioner on

remand, and before the ALJ entered her decision, Lillard turned eighteen.  Under

20 C.F.R. § 416.924(f) (2017),[4] therefore, the ALJ applied the child standard for

determining disability for the period before Lillard turned eighteen, and the adult

standard for the period from Lillard's eighteenth birthday up to the date of the

decision.  For both periods, the ALJ found that Lillard was not disabled.  (Tr. 667-

90.)  Lillard now seeks judicial review of that final adverse decision.  42 U.S.C. §

405(g).

With respect to the ALJ's child-disability decision, Lillard claims that the

ALJ ignored Judge Noce's directive and continued to improperly accord great

weight to the opinion of a non-examining state-agency psychologist in finding that

Lillard did not functionally equal the Listings.  Lillard also claims that the ALJ

ignored other evidence of record and failed to consider his environment when

determining his ability to function, as required by the Regulations.  As to the ALJ's

adult-disability decision, Lillard claims that the ALJ erred in assessing Lillard's

residual functional capacity (RFC) and erred by relying on the testimony of a

---

[4] Because the decision under review is dated August 3, 2017, I apply the Regulations that were in
effect at that time.  All citations to the C.F.R. are to the 2017 edition.

medical expert whose opinion was based on an incomplete review of the record. Lillard asks that I reverse the ALJ's decision and award benefits. Such relief is warranted in this case.

## Background[5]

This is a complicated case.

Lillard has had significant mental issues since a very young age, with the record showing that he was diagnosed in 2008 with major depressive disorder, ADHD, PTSD, and learning disabilities. He was ten years old. (Tr. 364-65.) He had been sexually abused by his father, and he witnessed his mother suffer severe physical and verbal abuse from his father and from another man with whom she later had a relationship. (Tr. 280-88.)

At the time of his diagnoses in 2008, Lillard was taking Adderall, Lexapro, and Clonidine (Tr. 364-65), and the record shows that he continued with these medications through 2009 and 2010 (*e.g.*, Tr. 291, 365).[6] Abilify was added to his medication regimen in 2010. (*See* Tr. 366, 370.) Lillard engaged in unusual behaviors during this period, including acting like a cat, eating inedible items, and making obscene gestures. He also heard voices at night and experienced dizzy

---

[5] In his August 2015 memorandum opinion, Judge Noce carefully summarized the medical and other evidence of record, which was dated through August 2013. (Tr. 692-712.) Those same records are included in the administrative transcript on this appeal. (Tr. 28-663.) For purposes of the present appeal, I adopt Judge Noce's summary of that evidence. Much of my summary regarding that period is taken from Judge Noce's memorandum, with additional details added through my independent review of the record.

[6] The record does not show when these medications were first prescribed or by whom.

spells which sometimes caused him to pass out.  (Tr. 335, 369-70.)[7]  In August

2010, at twelve years of age, Lillard was charged in circuit court with

misdemeanor assault and stealing.  (Tr. 90-91.)

Results from an autism diagnostic examination in August 2010 showed that

Lillard was impaired in socialization and adaptive behavior with clinically

significant problems with social communication, child behavior, and teacher-

observed behavior; clinically significant depression with negative mood,

interpersonal problems, and anhedonia; and clinically significant multidimensional

anxiety with physical symptoms and harm avoidance.  While the examiner felt that

Lillard did not qualify for an autism diagnosis, she noted that Lillard clearly had

symptoms of ADHD and social deficits with anxiety and depressive symptoms.

(Tr. 934-35.)

In September 2010, upon an increase in Lexapro, Lillard experienced an

increase in mood swings, depression, and frustration.  Lillard's psychiatrist, Dr.

Derlukiewicz, nevertheless instructed Lillard to take the Lexapro as prescribed.

Dr. Derlukiewicz also increased the Adderall dosage because of increased ADHD

symptoms.  (Tr. 340-41.)  Lillard's primary physician, Dr. Thornton, questioned

whether the increased medication caused Lillard's recent dizziness.  (Tr. 369.)

In December 2010, Lillard's mother applied for child's disability benefits on

_____

[7] Lillard's mother later reported to treating physicians that Lillard experienced dizziness since he
was two years old.  (*See* Tr. 1063, 1139.)

behalf of Lillard, with an onset date of November 17, 2010.

Despite Lillard's medication regimen, Dr. Derlukiewicz noted that Lillard continued to not do well, with continued depression, fatigue, lack of motivation, abusive behavior, short attention span, insomnia, and isolation. Throughout 2011, Dr. Derlukiewicz increased the dosages of all of Lillard's psychotropic medications. Although Lillard experienced intermittent periods of improvement with depressive and anxiety-related symptoms, he continued to have a short attention span. In November 2011, after months of increased dosages of medication, Lillard began feeling suicidal and was having suicidal thoughts. Concerned that Abilify caused these thoughts of self-harm, Lillard's mother stopped giving the medication to Lillard. Within days of stopping Abilify, Lillard's thoughts of suicide subsided, but his mood changes continued. (Tr. 526.)

In 2012, Lillard experienced several episodes of headaches, dizziness, feeling faint, and visual changes. In June 2012, Lillard's mother stopped all medications because she thought they caused these disturbances. Physical examinations by Dr. Thornton revealed nothing specific to cause the phenomena, which made him think that Lillard's psychosocial issues and a possible eating disorder were the source of the problem.

In October 2012, Lillard's school reported that Lillard was experiencing auditory hallucinations, was looking and behaving oddly, and was making suicidal statements. Lillard's mother continued to be concerned regarding the suspected

effects of Lillard's medication on his physical and mental state and determined to change psychiatrists. Lillard's mother testified before the ALJ that she felt that Dr. Derlukiewicz was just trying to push medications onto her child. In December 2012, Dr. Yager, Lillard's new psychiatrist, restarted Lillard on Lexapro.

In the meanwhile, Lillard continued to experience dizziness and fainting, and Dr. Thornton continued to suggest psychosocial emotional screening given that he could not identify a specific physical cause for the episodes. In February 2013, Lillard's mother discontinued all of Lillard's medications again, believing that they were the cause of the increased dizziness.

On May 28, 2013, Lillard was admitted to Blessing Hospital for cutting and suicidal ideation. He was fourteen years old. It was noted on admission that Lillard was taking Zoloft and that the dosage had recently been increased. (Tr. 559.)[8] During his hospitalization, Lillard began transitioning from Zoloft to Effexor and he was given both medications upon discharge on May 31. (Tr. 562-63.) On June 7, Lillard reported to Dr. Yager that he stopped taking Effexor because of increased dizzy spells. While he nevertheless continued to experience dizziness, he reported that it was not as severe as when he took Effexor. Dr. Yager diagnosed Lillard with major depressive disorder, moderate to severe, with history of psychotic features; PTSD; social anxiety; and ADHD. She instructed Lillard to

---

[8] Although counsel's brief to the Commissioner at the administrative level avers that Lillard was taking Zoloft as prescribed by Dr. Yager in March 2013 and that the dosage was increased at that time (*see* Tr. 581), there is no medical record in the administrative transcript documenting this.

continue with Zoloft and to take Effexor as prescribed by Blessing Hospital.  (Tr. 568.)

In August 2013, Dr. Yager noted that Lillard was taking both Zoloft and Effexor and complained of increased dizziness since restarting Effexor.  (Tr. 589-90.)  Upon Dr. Yager's suggestion that the Zoloft dosage be increased, Lillard complained that the last increase caused him to feel that things were not real. Noting that the several medications Lillard had taken before were either not helpful or caused side effects, Dr. Yager determined to maintain the current dosage of Zoloft.  She instructed Lillard to discontinue Effexor.  (Tr. 591.)

Between September 2013 and February 2014, Lillard continued to visit Dr. Yager, who continued him on his low-dose Zoloft.  Lillard continued to complain of dizziness but reported that it was not as severe.  During this period, Lillard had no suicidal ideations and his social anxiety had improved markedly.  He felt stable, had no worries, and was socializing more.  Mental status examinations were essentially normal during this period, and Dr. Yager kept Lillard on the same treatment regimen.  (Tr. 1062-73.)

On April 15, 2014, however, Lillard reported to Dr. Yager that he had been cutting again.  He reported that he had had the urge to hurt other people but cut on himself instead.  Lillard reported that he felt stressed and tense but was not sad. He had dizzy spells every week or two.  With these reports, Dr. Yager considered Lillard to be a suicide risk.  She increased Lillard's dosage of Zoloft and instructed

him to immediately seek treatment through therapy.  (Tr. 1074-78.)

Lillard was admitted to the Hannibal Medical Clinic on April 24 after having self-inflicted a deep cut on his leg, requiring stitches.  He reported having suicidal ideation and was transferred to Blessing Hospital for psychiatric care.  (Tr. 994.) Upon admission at Blessing, Lillard reported that his recent increase in medication made his psychological problems worse.  He felt helpless and hopeless and did not want to take any more medication because of its effects on him.  His insight and judgment were noted to be fair to poor, and his prognosis was poor.  He was discharged from Blessing on April 28 and was prescribed bupropion (Wellbutrin) upon discharge.  (Tr. 950-54.)  His diagnoses included major depression-recurrent-severe, PTSD, and social phobia.  (Tr. 1013.)

During a follow up visit with therapist Veronica Perkins on April 29, Lillard reported having issues with his gender identity, feeling like a man trapped in a girl's body.  (Tr. 1079.)

Lillard returned to the Hannibal Clinic on May 12 and reported that since starting Wellbutrin, he was experiencing chest pain, shortness of breath, racing heart, and stomach pains.  He was referred back to Dr. Yager for treatment of anxiety.  (Tr. 1017.)

In May and June 2014, both Dr. Yager and therapist Perkins noted that Lillard was showing improvement with self-esteem and positive mood.  Although Dr. Yager instructed Lillard to continue with Wellbutrin, Lillard's mother

discontinued the medication in June because of increased dizziness and racing heart. Dr. Yager suggested that Lillard visit Dr. Thornton regarding these physical symptoms but opined that Lillard may be experiencing panic attacks. Lillard indicated that he wanted to be off of all medications. (Tr. 1087-98.)

In September 2014, Lillard visited a neurologist at Cardinal Glennon Children's Hospital regarding his worsening dizziness. He reported that the episodes were sometimes accompanied by a racing heart, distorted vision, and chest pressure. He also reported that he had been experiencing headaches for about two years and that they were now occurring on a near-daily basis. With respect to his mood, he reported that he generally was doing well and was not overly anxious since he stopped his medications. Dr. Goretzke opined that Lillard's physical sensations may be caused by his lifestyle, that is, lack of hydration, excess caffeine, and no physical activity. Dr. Goretzke recommended that Lillard change these habits and return if there was no improvement. (Tr. 1145-47.)

There was no improvement. Lillard went to the emergency room on October 24 with worsening dizziness and headaches and complaints of forgetfulness. (Tr. 1152-78.)[9] He was noted to have an unstable gait, with near loss of balance. (Tr. 1161.) A brain CT scan showed hypoattenuation in the white matter of the right

---

[9] Lillard's mother reported that Lillard had forgotten his telephone number and how to work the microwave. (Tr. 1152.)

frontal lobe, described as a chronic lesion representing demyelination, infection, infarction, evidence of prior injury, or tumor. (Tr. 1170.) Florinef was prescribed for possible tactile tachycardia. (Tr. 1169.) An MRI performed November 10 showed irregular encephalomalacia[10] in the right frontal lobe with small cystic change, most likely the effect of a previous brain injury. (Tr. 1180-81.)

During a follow up visit on December 9, Lillard's mother informed Dr. Goretzke that she discontinued Florinef because it did not improve Lillard's symptoms. Lillard reported that his symptoms improved after discontinuing the medication. He continued to experience lightheadedness, however, and reported being unsteady when he had his most severe headaches. Dr. Goretzke opined that Lillard's condition was caused by a previous brain injury rather than a tumor. He acknowledged the difficulty in determining the extent to which Lillard's mental health issues, psychotropic medications, and neurologic issues interacted with each other over the years and encouraged Lillard to seek psychotherapy. Topamax was prescribed for headaches. (Tr. 1194-96.)

On April 14, 2015, Dr. Goretzke noted there to be marked improvement with Lillard's headaches and dizziness. Lillard reported that he had some intermittent tingling in his feet as a side effect of Topamax, which Dr. Goretzke indicated as

---

[10] "Encephalomalacia is the softening or loss of brain tissue after cerebral infarction, cerebral ischemia, infection, craniocerebral trauma, or other injury." *Encephalomalacia in the Frontal Lobe*, https://www.ncbi.nlm.nih.gov/pubmed/ 22134284 (Nov. 1, 2011) (last reviewed Mar. 4, 2019).

normal and nothing to be concerned about. With respect to memory problems associated with Topamax, Lillard's mother reported that Lillard always had memory issues and that they were not "clearly worse" with the medication. Lillard reported that he was more active and feeling better. He reported that stress affected his ability to relax, but he expressed reluctance regarding psychotropic medications or treatment. Dr. Goretzke continued to recommend psychotherapy but opined that medication was likely not needed for depression or anxiety. (Tr. 1208-09.)

Lillard visited therapist Perkins on July 14, 2015. He was seventeen years old. Perkins noted that it had been over a year since she had seen Lillard. Lillard's mother explained that they had spent the past year dealing with Lillard's neurologic issues and that it was now time to address Lillard's mood and anxiety. Lillard expressed confusion as to why he was at therapy, reporting that most of his issues involved not wanting to be around people. He talked about his depression and PTSD, however, from which Perkins suspected that his past sexual abuse was underreported. Another appointment was scheduled in two weeks, but Perkins noted that Lillard was reluctant about continuing with therapy. (Tr. 1099-1100.)[11]

Lillard returned to Dr. Goretzke on October 13, 2015, and reported continued dizziness and headaches but that they did not affect his functioning.

---

[11] There is no record that Lillard ever returned to Perkins or any other mental health provider before he turned eighteen.

Lillard complained that his memory loss had worsened since his last visit, but it was noted that he had always had memory issues. Noting Lillard's significant mental health history, Dr. Goretzke stated that it would be "impossible to know" if any of Lillard's mental health symptoms were related to his neurologic condition. He continued to encourage Lillard to seek psychological help, but it was noted that past negative experiences with psychotropic medications made him hesitant. Dr. Goretzke continued Lillard on Topamax. (Tr. 1214-15.)

Lillard graduated from high school in December 2015 with about twenty other students. Testimony before the ALJ showed that he worked to graduate a semester early so that he would not have to participate in the May graduation ceremony with large groups of people. (Tr. 1433.) Lillard had been in special education/contained classrooms since 2008. He was initially placed and remained in this environment for several reasons, including emotional disturbance, social behavioral problems, impaired interactions with peers, lack of social relationships, difficulty with instruction in large groups, and the need for highly-structured individualized instruction. The time Lillard spent in the special-ed/contained classroom eventually increased to 87 percent. He received A's, B's, and C's in his special-ed classes and D's and F's in classes where he was placed in a regular classroom. He ate his lunch in a separate "recovery" room with a counselor and was permitted to walk to class five minutes before the bell rang so that he could avoid students and other people in the hall. (Tr. 1409.) With accommodations,

Lillard took standardized tests in high school and scored Proficient in English-2, Basic in Biology and English-1, and Below Basic in Algebra and Government. (Tr. 900.)

On May 16, 2016, Lillard's high school special-ed teacher, Melinda Prenger, completed a checklist teacher questionnaire wherein she reported that she had worked with Lillard for four years and observed the following with respect to his functioning when compared to same-age children with no impairments:

- That Lillard had no or slight problems in acquiring and using information, with the only exception being that Lillard had an obvious problem understanding and participating in class discussions;
- That Lillard had no problems with attending and completing tasks;
- That with respect to interacting and relating with others, Lillard had a serious problem making and keeping friends and an obvious problem expressing anger appropriately, but otherwise primarily had no problems;
- That Lillard had no problems with moving about and manipulating objects; and
- That with respect to caring for oneself, Lillard had obvious problems with cooperating in or being responsible for taking needed medication, and using good judgment regarding personal safety and dangerous circumstances; serious problems with handling frustration appropriately and using appropriate coping skills to meet daily demands of the school environment; and very serious problems with identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and knowing when to ask for help.

(Tr. 875-882.) In response to narrative questions, Ms. Prenger explained:

- That anxiety with unfamiliar social situations limited Lillard's interaction with the public, affecting his daily life;
- That Lillard's social limitations prevented him from being involved or around large groups of people;
- That Lillard required smaller class sizes and behavior supports;
- That medication lessened the intensity of the social concerns but did not

eliminate them;

- That when on medication, Lillard suffered side effects of being tired and withdrawn;
- That Lillard spent full days in resource and self-contained classrooms;
- That Lillard experienced difficulty following through with new tasks, especially in social situations;
- That Lillard experienced difficulty with new concepts but retention was achieved with repetition;
- That any connection with unfamiliar adults was strained and caused anxiety; and
- That Lillard's emotional pain was apparent through his facial and body cues, his shutting down, retreating into himself, and excessive drawing and writing.

Ms. Prenger opined that, based on her observations, she believed that Lillard would always be limited by his emotional needs. With respect to work limitations, she opined that Lillard would need a supportive, small group of people in a caring environment with repetitive tasks. (Tr. 870-73.)

Lillard returned to Dr. Goretzke on May 24, 2016, and reported that his memory loss was worsening. Given the relative stability of Lillard's memory issues during his first few follow-up examinations after starting Topamax, Dr. Goretzke opined that the recent worsening was related to Lillard's anxiety and other mental health issues. Dr. Goretzke again strongly suggested that Lillard seek assistance from mental health professionals. (Tr. 1220-21.)

On June 22, 2016, Lillard turned eighteen.

Upon referral by his neurologist, Lillard visited Preferred Family Healthcare on August 18, 2016, for a psychosocial assessment. Lillard's primary complaints

were of anxiety and dizziness.  He reported experiencing sweaty palms, tight

throat, heart pain, shakiness, and a desire to flee.  He reported that he experiences

these severe symptoms when he tries to leave the house.[12]  Lillard had no current

suicidal ideation and reported that past suicidal thoughts and ideations were related

to the medication he was taking at the time.  He reported needing extensive help

from his mother.  The examiners noted that Lillard struggled with communication

and demonstrated limited verbal communication.  They considered Lillard to have

marked limitations with safety issues given his forgetfulness and dizzy spells;

marked limitations with time management given his irregular sleep patterns,

inconsistent eating patterns, no structure with routine, and appointment

management by his mother; marked limitations with nutrition given his substantial

dependence on others; and severe limitations with problem solving given that he

relies on family to solve basic daily living issues.  Lillard had no friends and could

only go out into the community if his mother accompanied him.  He reported using

coping skills every day and that crying as a coping skill helped a lot.  Lillard was

diagnosed with major depressive disorder-recurrent-severe, PTSD, social anxiety

disorder, and panic disorder.  He was assigned a Global Assessment of Functioning

_____

[12] According to Lillard's testimony at the hearing on February 10, 2017, he was living with his
grandparents at this time and had been living with them for about four years.

(GAF) score of 33.[13]  A community caseworker, Ginny King, was assigned to work with him to achieve identified goals.  (Tr. 1259-94.)[14]

Lillard visited Dr. Spalding, a psychiatrist with Clarity Healthcare, on August 30, 2016.  Lillard reported that he did not want to take any psychotropic medications because of his suicidal tendencies associated with past medications. Lillard continued to take Topamax.  Dr. Spalding noted Lillard to be anxious.  He diagnosed Lillard with PTSD (moderate), social anxiety disorder (severe), and panic disorder (moderate).  He referred Lillard to therapy.  (Tr. 1250-53.)

Lillard visited therapist Shelly Flachs, LCSW, at Clarity Healthcare on September 12, 2016, and reported that his anxiety caused difficulty with concentration.  Mental status examination showed Lillard's attention and concentration to be impaired, and he exhibited slowed thinking.  Lillard had difficulty acknowledging the presence of psychological problems.  He stated that he would like to get his driver's license but could not focus.  Caseworker King agreed and reported, as an example, that Lillard does not think about looking both

---

[13] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  *Diagnostic and Statistical Manual of Mental Disorders*, Text Revision 34 (4th ed. 2000).  A GAF score of **Error! Main Document Only.** 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.*

[14] At the hearing before the ALJ on February 10, 2017, Lillard testified that King was a counselor at his high school and ate lunch with him in the recovery room.  As his community caseworker, King meets with Lillard every week and accompanies him to doctor's and therapy appointments.

ways when crossing the street.  Lillard was continued in his diagnoses of PTSD,

social anxiety, and panic disorder.  (Tr. 1245-49.)  On September 19, Flachs noted

progress with Lillard's coping skills.  He was happy, thoughtful, logical, and

relaxed.  He reported that he went to the store during the previous week, although

it made him anxious.  Flachs assigned a GAF score of 70.[15]  (Tr. 1242-44.)

Lillard returned to Flachs on October 3 who opined that Lillard was making

good progress.  He was pushing himself to go places despite his desire to not leave

the house.  Mental status examination showed Lillard to be paranoid, preoccupied,

and impaired in his ability to make reasonable decisions.  Although he exhibited

more confidence, Lillard continued to have difficulty acknowledging the presence

of his psychological problems.  (Tr. 1239-41.)

Lillard appeared less anxious on November 7.  Flachs noted Lillard to be

making progress regarding his gender identity.  He asked about participating in a

support group with similarly-situated peers.  Flachs noted that Lillard exhibited a

positive mood and affect, and he appeared upbeat.  He was looking into taking

online college courses.  Lillard continued to experience anxiety, especially with

talking on the telephone and going to the store.  He was continued in his diagnoses.

(Tr. 1236-38.)

---

[15] **Error! Main Document Only.**A GAF score of 61 to 70 indicates some mild symptoms (*e.g.*,
depressed mood and mild insomnia) or some difficulty in social, occupational, or school
functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning
pretty well, has some meaningful interpersonal relationships.

Lillard returned to Dr. Spalding on January 10, 2017, and reported that he continued to isolate himself at home but wanted to go to college. He avoided sleep at night because of nightmares; he slept during the day. Mental status examination showed that Lillard avoided eye contact, had a tense posture, and was anxious. Dr. Spalding continued to diagnose Lillard with PTSD (moderate), social anxiety disorder (severe), and panic disorder (moderate). He indicated that the overall severity of Lillard's mental impairments was moderate. Dr. Spalding prescribed hydroxyzine (Vistaril)[16] and instructed Lillard to continue with therapy. (Tr. 1314-17.)

Dr. Spalding completed a Mental Medical Source Statement for disability determinations on January 19, 2017, wherein he opined that Lillard had mild limitations in his ability to understand, remember, and carry out simple instructions; moderate limitations in his ability to make judgments on simple work-related decisions and to understand and remember complex instructions; and marked limitations in his ability to carry out complex instructions and to make judgments on complex work-related decisions. Dr. Spalding further opined that Lillard had marked to extreme limitations in his ability to interact appropriately with the public, with supervisors, and with coworkers; and marked to extreme limitations in his ability to respond appropriately to usual work situations and to

---

[16] Hydroxyzine is an antihistamine used for its sedative effects to relieve anxiety and tension. *Medline Plus*, hydroxyzine, https://medlineplus.gov/druginfo/meds/a682866.html (last revised Feb. 15, 2017).

changes in a routine work setting. He further opined that Lillard's impairments would cause him to miss work more than four days a month and be off task at least 25 percent of a workday. As support for his opinions, Dr. Spalding pointed to Lillard's severe anxiety and panic, distrust of others, and his struggle to leave his home. He concluded that Lillard could not work in any capacity. (Tr. 1304-06.)

Lillard visited Dr. Spalding again on February 9 and reported that Vistaril helped with his sleep but that he continued to have nightmares every night. He also reported that he still could not leave the house without being accompanied by family. Dr. Spalding noted that Lillard's ADHD symptoms had increased, including lack of focus, inattention, and hyperactivity. He also noted that Lillard's activity during the appointment was "peculiar." Lillard continued to express an unwillingness to take psychotropic medication. Dr. Spalding diagnosed Lillard with PTSD (moderate), panic disorder (moderate), ADHD (moderate), and social anxiety disorder (severe). He strongly supported Lillard's efforts to obtain disability and expressed hope that improvement of Lillard's anxiety would restore his ability to work or attend school in the future. (Tr. 1307-10.)

### Medical Expert Testimony

On June 10, 2016, Dr. Ashok Khushalani responded as a medical expert to written interrogatories posed to him by the ALJ. Dr. Khushalani opined that, as a child, Lillard suffered from major depressive disorder, ADHD, and PTSD, which caused difficulties paying attention, focusing, and getting along with people, and

further caused low frustration tolerance and impulsivity.  He opined that Lillard had done reasonably well with treatment and educational adjustments.  He opined that Lillard had less-than-marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, and Health and Physical Well Being; and no limitations in the domains of Moving About and Manipulating Objects, and Caring for Yourself.  As his only support for these opinions, Dr. Khushalani referred to a teacher evaluation dated February 2010 and stated that Lillard had "responded well to meds."  (Tr. 1122-28.)  Dr. Khushalani further opined that, as an adult, Lillard had no more than moderate limitations in his ability to engage in work-related activities, concluding that Lillard could perform work involving simple, repetitive tasks with occasional public contact.  (Tr. 1130-37.)[17]

At the hearing before the ALJ on February 7, 2017, Dr. Khushalani testified that his review of additional records that post-dated his interrogatory answers did not change his June 2016 opinions.

## Legal Standards

A.  Child Disability

A claimant under the age of eighteen is considered disabled and eligible for SSI under the Social Security Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and

---

[17] Notably, Lillard was not yet an adult when Dr. Khushalani gave this opinion.

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe.  Finally, if the child's impairment(s) is severe, the Commissioner must determine whether it meets, medically equals, or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations.  20 C.F.R. § 416.924(a); *Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 647 (8th Cir. 2004).  If the impairment(s) meets or medically equals a Listing, the child is disabled.  *Garrett*, 366 F.3d at 647.  If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings.  20 C.F.R. § 416.926a.  If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled.  *Wigfall v. Berryhill*, 244 F. Supp. 3d 952, 956 (E.D. Mo. 2017).

To functionally equal a listed impairment, the child's condition must result

in an "extreme" limitation in one domain of functioning or "marked" limitations in two domains. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making this determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Yourself; and 6) Health and Physical Well-Being. *Id.*

> A child-claimant has a "marked" limitation in a domain when his
>
> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities. [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i). A child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner must review all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); *see also* 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how

appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments."); 20 C.F.R. § 416.924a(b)(5).  For children who have spent time in structured or supportive settings, such as special classrooms or residential facilities, the Commissioner is to consider whether and to what extent such structured setting affects the child's functional limitations and how the child would function outside of such setting.  20 C.F.R. § 416.924a(b)(5)(iv).

B.    Adult Disability

An adult claimant is eligible for SSI under the Social Security Act if he proves that he is disabled, that is, if he shows that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  *See also Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner engages in a five-step evaluation process to determine

whether an adult claimant is disabled. *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The first three steps involve a determination as to whether the claimant is currently engaged in substantial gainful activity; whether he has a severe impairment; and whether his severe impairment(s) meets or medically equals the severity of a listed impairment. At Step 4 of the process, the ALJ must assess the claimant's RFC – that is, the most the claimant is able to do despite his physical and mental limitations, *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) – and determine whether the claimant is able to perform his past relevant work. *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005) (RFC assessment occurs at fourth step of process). If the claimant is unable to perform his past work, the Commissioner continues to Step 5 and determines whether the claimant can perform other work as it exists in significant numbers in the national economy. If so, the claimant is found not to be disabled, and disability benefits are denied.

The claimant bears the burden through Step 4 of the analysis. If he meets this burden and shows that he is unable to perform his past relevant work, the burden shifts to the Commissioner at Step 5 to produce evidence demonstrating that the claimant has the RFC to perform other jobs in the national economy that exist in significant numbers and are consistent with his impairments and vocational factors such as age, education, and work experience. *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). If the claimant has nonexertional limitations, including

those caused by a severe mental impairment, the Commissioner may satisfy her burden at Step 5 through the testimony of a vocational expert.  *King v. Astrue*, 564 F.3d 978, 980 (8th Cir. 2009).

C.    Standard of Review

For both child and adult disability, the Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Young v. Shalala*, 52 F.3d 200 (8th Cir. 1995) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Briggs v. Callahan*, 139 F.3d 606, 608 (8th Cir. 1998).  In evaluating the substantiality of the evidence, I must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision.  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

Where substantial evidence supports the Commissioner's decision, I must affirm, even if a different conclusion may be drawn from the evidence. *McNamara*, 590 F.3d at 610.  However, where the record instead "overwhelmingly supports" a finding of disability, reversal and remand for an immediate award of benefits is the appropriate remedy.  *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009); *see also Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984) ("Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.").

# The ALJ's Decision

In her written decision, the ALJ determined that Lillard had not engaged in substantial gainful activity since November 17, 2010. She further found that Lillard's impairments of headaches, ADHD, major depressive disorder, learning disability, and PTSD were severe but that they did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 672.)

With respect to Lillard's child disability claim, the ALJ found that Lillard's severe impairments did not functionally equal the severity of the Listings. Specifically, the ALJ found that while Lillard had marked limitations in the domain of Interacting and Relating with Others, he had less-than-marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Caring for Yourself, and Health and Physical Well-Being; and no limitations in the domain of Moving About and Manipulating Objects. Because Lillard did not have marked limitations in at least two domains or extreme limitations in one domain, the ALJ concluded that Lillard was not disabled before his eighteenth birthday. (Tr. 680-85.)

As to adult disability, the ALJ found that, since attaining age eighteen, Lillard had not acquired any new impairments and that his existing impairments, albeit severe, did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 685.) The ALJ found that Lillard had the RFC to

perform a full range of work at all exertional levels but with the following

nonexertional limitations:

> the claimant can perform work that does not require climbing on
> ladders, ropes, or scaffolds. He should avoid exposure to work
> hazards such as unprotected heights and being around dangerous
> moving machinery. He cannot drive as a primary job function. He
> should not be exposed to more than moderate, office-level noise. The
> claimant is able to understand, remember, and carry out simple
> instructions with repetitive tasks consistent with unskilled work in a
> job where there are no strict production quotas and he would not be
> subject to the demands of fast-paced production work, i.e., work by
> the shift not by the hour. He can tolerate occasional interaction with
> coworkers and supervisors, but in small numbers and for short periods
> of time, no tandem tasks and work is done relatively independently,
> and minimal superficial interaction with the general public.

(Tr. 686.) The ALJ determined that Lillard had no past relevant work.

Considering Lillard's RFC, age, and education, the ALJ found vocational expert

testimony to support a conclusion that Lillard could perform work as it exists in

significant numbers in the national economy, and specifically, as a laundry worker,

garment sorter, and cloth or garment bagger. (Tr. 689-90.) The ALJ thus found

that Lillard had not been under a disability since his eighteenth birthday through

the date of the decision. (Tr. 690.)

## Discussion

It is difficult to know where to begin in this case. Lillard raises specific

challenges to the ALJ's decision, and all of his challenges have merit. But there

are many other issues with the decision that cause me great concern. While Lillard

is entitled to relief on the basis of his specific claims, the overall egregiousness of

the ALJ's errors is so substantial that additional discussion is warranted – not only to underscore the lack of substantial evidence supporting the ALJ's decision, but to also highlight the overwhelming evidence showing that Lillard meets the criteria for disability under the Social Security Act.

I will begin with Lillard's specific claims.

A.    Opinion Evidence of Non-Examining, State-Agency Psychologist Joan Singer

On February 4, 2011, Joan Singer, Ph.D., a psychological consultant with disability determinations, completed a Childhood Disability Evaluation Form in conjunction with the Social Security Administration's initial consideration and denial of Black's December 2010 application for benefits o/b/o Lillard.  In this disability evaluation, Dr. Singer opined that Lillard's ADHD, depressive disorder, learning disability, and PTSD caused marked limitations in the domain of Interacting and Relating with Others; less-than-marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Caring for Yourself; and no limitations in the domains of Moving About and Manipulating Objects, and Health and Physical Well-Being.  As support for her opinions, Dr. Singer relied on a February 2010 teacher evaluation and cited evidence that Lillard's behavior improved shortly after starting Abilify.  (Tr. 378-82.)

In her August 2013, decision denying child benefits to Lillard, the ALJ relied on the teacher evaluation, Dr. Singer's disability evaluation, and a single

GAF score issued by Dr. Yager in June 2013. (Tr. 13-27.) Judge Noce reversed this decision, emphasizing in his memorandum opinion that the 2010 teacher evaluation did not constitute substantial evidence of Lillard's functioning in the various domains and that, instead, substantial evidence on the record as a whole showed Lillard to be more limited than described. Judge Noce determined that because Dr. Singer's disability evaluation was based almost exclusively on this teacher evaluation, the disability evaluation itself was not substantial evidence upon which the ALJ could rely in finding Lillard not disabled. (Tr. 692-712.) Judge Noce also found that the ALJ failed to account for the substantial evidence of record showing that any improvement in Lillard's symptoms through medication was short-lived and, further, failed to acknowledge that the adverse side effects of Lillard's medications were not outweighed by the medications' benefits. (*Id.*) Accordingly, Dr. Singer's February 2011 finding that medication improved Lillard's functioning likewise could not constitute substantial evidence upon which the ALJ could rely.

Nevertheless, on remand, the ALJ again accorded great weight to and relied on the February 2010 teacher evaluation and Dr. Singer's February 2011 disability evaluation to support her findings regarding Lillard's level of functioning in the various domains. (Tr. 678, 679.)[18] Justifying the "great weight" accorded to Dr.

---

[18] In varying degrees, the ALJ accorded less weight to all other opinion and evaluation evidence of record.

Singer's evaluation, the ALJ stated that Dr. Singer was an expert in social security disability; that Dr. Singer "had access to a significant number of the claimant's medical records when formulating her opinion"; and that her opinion was generally consistent with the other evidence of record, including treatment notes, Lillard's response to treatment, and teacher questionnaires. (Tr. 678.) This is simply not true.

At the time of her August 2017 decision, the ALJ had nearly 1000 pages of relevant medical and educational records dated from October 2008 through June 2016. Over half of those records document Lillard's treatment and level of functioning post-February 2011, that is, after Dr. Singer completed her evaluation. Those post-February 2011 records demonstrate, *inter alia*, that Lillard obtained only limited and intermittent benefit from his medication; that the medication caused unacceptable and life-threatening side effects, including suicidal ideation that resulted in psychiatric hospitalizations; and that the level of school intervention and accommodation substantially increased because of Lillard's behavioral, emotional, and cognitive limitations. The ALJ was simply wrong to find that Dr. Singer's opinions, including that Lillard improved with medication, were consistent with this subsequently-obtained evidence.

Also, most notably, Dr. Singer did not have the benefit of the neurologic evidence – which was first obtained in 2014 – showing that Lillard suffered from a brain injury that accounted for, at least in part, Lillard's several-year history of

dizziness and headaches, with such dizziness exacerbated by psychotropic medication. Indeed, given the evidence of brain injury, Lillard's neurologist opined in 2014 and 2015 that determining the extent to which Lillard's mental health issues, psychotropic medications, and neurologic issues interacted with each other over the years would be nearly impossible. Curiously, the ALJ not only fails to account for Dr. Singer's inability to review this evidence, but herself ignores entirely this significant medical evidence, including the fact that Lillard underwent CT scans and MRIs that resulted in the brain-injury diagnosis. Indeed, contrary to this substantial medical evidence, the ALJ writes that "no medical reason was found for the claimant's fainting and dizziness." (Tr. 676.)

The ALJ's wholesale failure to acknowledge evidence of Lillard's brain injury and the neurologist's opinions regarding its interaction with Lillard's mental impairments and psychotropic medications demonstrates that the ALJ did not review the record *as a whole* when rendering her decision. "[T]he ALJ is not free to ignore medical evidence but rather must consider the whole record." *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000). *See also Strongson v. Barnhart*, 361 F.3d 1066, 1071 (8th Cir. 2004) (improper for ALJ to ignore evidence in the record that provides uncontroverted evidence of an impairment). By ignoring this relevant medical evidence of Lillard's diagnosed brain injury and its effect on Lillard's functioning – both alone and in combination with Lillard's mental impairments and medications – the ALJ failed to consider not only a medically-determinable

impairment, but the combined effect of all of Lillard's impairments (whether severe or non-severe) on his functioning. *Arnick v. Sullivan*, 921 F.2d 174 (8th Cir. 1990). Where, as here, the evidence conclusively shows that a claimant's impairments and treatment therefor contribute to the adverse effects of each other, an ALJ errs when she fails to consider the combined effect of the impairments. *Id.*

All of this underscores the ALJ's error in giving great weight to and relying on Dr. Singer's disability evaluation to deny Lillard benefits. It is well established that opinions of non-examining sources are generally given less weight than those of examining sources, *Willcockson v. Astrue,* 540 F.3d 878, 880 (8th Cir. 2008); and that when weighing the opinion of a non-examining source, the ALJ must evaluate the degree to which the source considered all of the pertinent evidence and the degree to which the source provides supporting explanations for her opinion. 20 C.F.R. § 416.927(c)(1), (c)(3).

Here, the ALJ accorded great weight Dr. Singer's opinion – an opinion from a non-examining source that Judge Noce had already determined could not constitute substantial evidence because it was based on a teacher evaluation that itself was not supported by substantial evidence. Further, Dr. Singer did not have access to substantial medical evidence showing that Lillard's medication provided only limited relief and caused significant adverse effects that exacerbated his mental symptoms. She did not have access to school records showing that Lillard remained in full-day special education classes throughout high school, with

observed "high" needs for structure and safety. (Tr. 233.) Nor did she have the evaluation of Lillard's high school special education teacher detailing the extent to which Lillard's mental impairments limited his contact with people, caused him to shut down and withdraw, caused difficulty with new tasks and new concepts, and required him to have behavioral support and remain in a self-contained classroom throughout high school. Finally, she did not have access to the substantial medical evidence of Lillard's diagnosed brain injury and its incalculable effects on Lillard's mental symptoms. For the ALJ to accord great weight to and "concur" in Dr. Singer's unsupported and uninformed opinions was error. *See Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001) (opinion of non-examining source not substantial evidence where source did not have benefit of claimant's medical records and did not provide specific medical findings to support opinion). *See also McCoy v. Astrue,* 648 F.3d 605, 616 (8th Cir. 2011) (opinion of non-examining medical consultant afforded less weight when consultant did not have access to relevant medical records, including records made after date of assessment); *Mayo ex rel. D.L. v. Astrue*, 4:11–CV201 LMB, 2012 WL 996580 (E.D. Mo. Mar. 22, 2012) (remanding, in part, because the only medical evidence supporting the ALJ's finding that the claimant had a less-than-marked limitation was over a year old and submitted by consultative psychologists who did not have the benefit of the majority of the records before them).

B.      Failure to Consider Structured Environment

1.      *Considerations for Child Disability*

A structured or supportive setting may minimize signs and symptoms of a child's impairment(s) and help to improve his functioning while in it; but his signs, symptoms, and functional limitations may worsen outside this type of setting. Therefore, an ALJ must consider the child's need for a structured setting and the degree of limitation in functioning he has or would have outside the structured setting. Even if the child is able to function adequately in the structured or supportive setting, the ALJ must consider how he functions in other settings and whether he would continue to function at an adequate level without the structured or supportive setting. 20 C.F.R. § 416.924a(b)(5)(iv)(C). A structured or supportive setting may include special classrooms, accommodations in regular classrooms, or adjustments made at home to accommodate the impairment(s). 20 C.F.R. § 416.924a(b)(5)(iv)(B).

Here, the ALJ acknowledged that Lillard was in special education classes at school and received the benefit of individualized instruction and small-group settings. Noting that Lillard received good grades in his special-ed classes and graduated early, the ALJ found his complained-of mental symptoms to be inconsistent with his overall ability to perform well in school. (Tr. 675-76.) The ALJ failed to consider, however, whether Lillard's ability to perform well in school was *because* of the highly structured setting within which Lillard learned.

Other than acknowledging that Lillard's grades appeared to fall in regular-ed classes, the ALJ did not consider how Lillard would function outside of the structured setting. This is contrary to the mandate of § 416.924a(b)(5)(iv)(C). *See also* 20 C.F.R. § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments."). Accordingly, it cannot be said that the ALJ's analysis of Lillard's limitations in the various domains of functioning is supported by substantial evidence on the record as a whole.

## 2. *Considerations for Adult Disability*

An ALJ must likewise consider structured settings when evaluating adult disability. The Regulations governing mental impairments require an ALJ to consider whether a claimant's structured life may mask the effects of a chronic mental impairment regarding his ability to work. *See* Listing § 12.00(C)(6)(b), (D), and (F)(3)(e). The failure to consider evidence of record in this regard demonstrates a failure to properly analyze the effects of a structured setting as required by the Regulations. *See id.* § 12.00(D)(3)(b).[19]

---

[19] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(3)(b) provides:

> You may receive various kinds of help and support from others that enable you to do many things that, because of your mental disorder, you might not be able to do independently. Your daily functioning may depend on the special contexts in which you function. For example, you may spend your time among only familiar people or surroundings, in a simple and steady routine or an unchanging environment, or in a highly structured setting. However, this does not necessarily show how you would

> Simply put, the nature of the medical condition and the nature of the
> life activities, including such considerations as independence, should
> be considered against the backdrop of whether such activities actually
> speak to claimant's ability to hold a job. Participation in activities
> with family or activities at home and "at your own pace" may not
> reflect an ability to perform at work.

*Nowling v. Colvin*, 813 F.3d 1110, 1121-22 (8th Cir. 2016).

Here, the ALJ wholly failed to consider the structure within which Lillard

functions in his adult life. Substantial evidence on the record shows that, as an

adult, Lillard is unable to go out into the community without being accompanied

by a family member or his caseworker. He meets with his caseworker every week,

and she takes him to his appointments. Lillard lives in an upstairs room in his

grandparents' home. He helps his grandparents with some chores, but only in the

home. He sleeps during the day because recurring nightmares make him afraid to

sleep at night. While the ALJ noted that Lillard's ability to play video games,

write, read, and draw shows that he can focus and concentrate, she failed to

recognize that Lillard engages in all of these non-interactive activities only at

home. Further, Lillard cannot manage finances because he has none. He

substantially depends on others for meals and nutrition, and he relies on family to

solve basic daily living issues. When individuals with mental illness have their

lives structured to minimize stress and reduce their signs and symptoms, they "may

be much more impaired for work than their signs and symptoms would indicate."

---

function in a work setting on a sustained basis, throughout a normal workday and
workweek.

*Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) (internal quotation marks and citation omitted).

The record shows, and the ALJ noted, that Lillard was making progress in late 2016 with regular psychotherapy. However, recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation. *Rowland v. Astrue,* 673 F. Supp. 2d 902, 920-21 (D.S.D. 2009) (citing *Jones v. Chater,* 65 F.3d 102, 103 (8th Cir.1995)). "Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." *Andler*, 100 F.3d at 1393 (internal quotation marks and citation omitted). "Although the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." *Id.*

The ALJ did not consider the waxing and waning nature of Lillard's mental illness but instead focused only on the limited period of improvement in late 2016. Indeed, although she summarized Dr. Spalding's February 2017 treatment note, the ALJ did not acknowledge Lillard's worsening symptoms and "peculiar" behavior that Dr. Spalding observed at that time. Regardless, even for the limited period during which Lillard showed improvement, the ALJ failed to consider the extent to which Lillard's symptoms may have been controlled or attenuated by the support

he received and/or the structure of his daily life.[20]  This failure runs afoul of the

Regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D); *Freeman v. Colvin*,

No. 4:15-CV-00968-NKL, 2016 WL 4620706, at *5 (W.D. Mo. Sept. 6, 2016);

*Lonidier v. Colvin*, No. 4:13CV1075 TCM, 2014 WL 2864771, at *19 (E.D. Mo.

June 24, 2014).

Accordingly, because the ALJ failed to consider the extent to which

structured settings and supportive environments affected Lillard's ability to

function both as a child and an adult, her determination that Lillard's level of

functioning did not render him disabled is not supported by substantial evidence.

C.     Evidence Adduced from Medical Expert

In denying Lillard child disability benefits, the ALJ concurred with medical

expert Dr. Khushalani's opinion that Lillard had less than marked limitations in the

domains of Acquiring and Using Information, and Attending and Completing

Tasks.  (Tr. 680-81.)  In denying adult benefits, the ALJ accorded "mostly great

weight" to Dr. Khushalani's opinion that Lillard was moderately limited in his

ability to understand, remember, or apply information; interact with others;

concentrate, persist, or maintain pace; and adapt or manage himself.  The ALJ

further accorded "mostly great weight" to Dr. Khushalani's opinion that Lillard

could engage in simple work with limited public contact.  (Tr. 687-88.)  The ALJ

---

[20] Notably, even though Lillard was making progress in late 2016 with regular psychotherapy, the structure in Lillard's life did not diminish.

determined to accord such weight to Dr. Khushalani's opinions because he "had access to a significant number of the claimant's medical records when formulating his opinion and his opinion is generally consistent with the medical course of the claimant's impairments as reflected in the record as a whole." (*Id.*) For the following reasons, the ALJ erred in according any weight to Dr. Khushalani's opinions.

As discussed above regarding Dr. Singer's opinion, the opinion of a non-examining medical source is generally given less weight than an opinion from an examining source. "[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. § 416.927(c)(3); *see also Papesh v. Colvin*, 786 F.3d 1126, 1133 (8th Cir. 2015). "[O]pinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003).

In his June 2016 response to interrogatories, Dr. Khushalani cited the 2010 teacher evaluation as his only support for his opinions regarding Lillard's level of functioning in the various domains. (*See* Tr. 1126-27.) As discussed above, however, this teacher evaluation is not substantial evidence of Lillard's functioning, especially given the significant relevant evidence that post-dated this

evaluation. Dr. Khushalani's February 2017 hearing testimony did nothing to clarify the support for his opinions, and in fact demonstrated just how unsupported his opinions were.

First, Dr. Khushalani initially testified that there was sufficient evidence in the record from which he could form an opinion. (Tr. 1460.) He later complained of the fragmented record, however, and testified that he could not determine from the record whether there was a continuum in the level to which Lillard was affected by his impairments. (Tr. 1472.)[21] He also admitted to not reviewing the full record and that he therefore could not testify to whether Lillard would have benefited from medication other than what was prescribed. (Tr. 1479.)

Further, Dr. Khushalani focused his testimony only on Lillard's functioning in the classroom that his teachers considered not to be marked. He did not consider either the opined marked limitations or the effect of Lillard's structured classroom environment on his level of functioning. Nor did he opine as to how Lillard would perform outside this setting. (Tr. 1462-63.) Dr. Khushalani also testified that certain of Lillard's listing-level behaviors – *i.e.*, eating inedible items, disturbance in sleeping and eating patterns, ignoring safety rules, failing to complete or turn in assignments – may simply be passing phases in development rather than signs of a disabling impairment. (Tr. 1464.) He similarly testified that

---

[21] Dr. Khushalani incongruously recommended that Lillard undergo a consultative examination – that is, a one-time examination – in order to show a continuum in Lillard's functioning. (Tr. 1472.)

symptoms of social anxiety are simply milestones in a child's development. (Tr. 1469.)

Dr. Khushalani also based his opinions on his perception that Lillard stopped taking medication in June 2012 for no known reason. (Tr. 1465-66.)[22] Although the ALJ corrected him and averred that medication was stopped because of dizziness and suicidal ideations, Dr. Khushalani nevertheless remained critical, stating that other medications should have been tried given the evidence of Lillard's improvement on his earlier medications.[23] As shown by the record, however, and as described earlier in this opinion, Lillard in fact was prescribed and took medication after June 2012, namely, Lexapro, Zoloft, Effexor, and Wellbutrin. Also, Lillard's supposed "improvement" with medication is likewise contrary to the record when reviewed as a whole.

As the hearing went on, it became more and more apparent that Dr. Khushalani had not reviewed the relevant evidence of record. While he could list the general symptoms of major depressive disorder, ADHD, and PTSD, he could not identify how Lillard himself manifested such symptoms nor identify any record documenting them. (Tr. 1489-92.) Nor could Dr. Khushalani testify to how Lillard's impairments affected his functioning, or whether and to what extent he

_____

[22] Dr. Khushalani later indicated that the ALJ's interpretation of the medical records caused him to be confused regarding Lillard's medication regimen. (Tr. 1480-81.)

[23] As noted earlier, Dr. Khushalani testified that he could not give an opinion as to what other medications should have been tried because he did not review the full record.

engaged in any coping skills to manage symptomatic episodes. He admitted to not having reviewed progress notes from Clarity Healthcare dated August 6, 2015, to November 7, 2016, and to mis-citing evidence in his interrogatory responses. (Tr. 1486, 1492-94.) He criticized the findings made in Dr. Spalding's Mental Medical Source Statement because they were not based on any medical records (Tr. 1473-75), but, as pointed out during the hearing, Dr. Spalding's opinion was based on the records that Dr. Khushalani admitted to not reviewing. (*See* Tr. 1477.)[24] I find it disingenuous for Dr. Khushalani to criticize a treating physician's opinion as not being based on medical records when his own opinion lacks such a basis.

As with her reliance on Dr. Singer's unsupported and uninformed opinion, the ALJ likewise erred in her reliance on Dr. Khushalani's similarly unsupported and uninformed opinions. Because Dr. Khushalani's opinions do not constitute substantial evidence, the ALJ erred in relying on them to find that Lillard was not disabled.

D.    Overwhelming Evidence of Disability

1.    *Child Disability*

There is no dispute that during the relevant period, Lillard suffered marked limitations in the domain of Interacting and Relating with Others. The

---

[24] Upon Dr. Khushalani's admission during the hearing that he did not review certain records and could not cite relevant record evidence, the ALJ summarized the records for him and, in some instances, read them to him. (*See*, *e.g.*, Tr. 1466, 1469-77, 1480-81, 1496.)

overwhelming evidence also shows, at a minimum, that Lillard suffered marked limitations in the domain of Caring for Yourself. Accordingly, because Lillard suffered marked limitations in at least two domains of functioning, his impairments functionally equaled the Listings under 20 C.F.R. § 416.926a(a). Lillard is therefore entitled to child disability benefits.

In the domain of Caring for Yourself, the Commissioner is to consider how well the child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). Limited functioning can be shown in this domain by continual placement of non-nutritive or inedible objects in the mouth; by engaging in self-injurious behavior, such as suicidal thoughts or actions, or self-inflicted injury; by ignoring safety rules; and by experiencing disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3); *Garrett*, 366 F.3d at 652.

With respect to measuring the extent to which a child is limited in this domain, the Regulations explain that adolescents age twelve to eighteen should be increasingly independent in all of their day-to-day activities, with increasing independence in making and following their own decisions. 20 C.F.R. § 416.926a(k)(2)(v). The Commissioner looks to the child's ability to cope with stress and respond to daily demands in his environment, including his ability to

help himself and cooperate with others in taking care of his personal needs, health, and safety.  With respect to the child's physical and emotional needs, he must employ effective coping strategies to identify and regulate his feelings and take responsibility for getting his needs met in an appropriate and satisfactory manner. 20 C.F.R. § 416.926a(k)(1).

The record here shows that during his middle school years, Lillard engaged in injurious and unhealthy behavior, including cutting, having suicidal ideations, eating inedible items, and taking aggressive and assaultive actions.  His coping mechanisms involved crying and retreating to his room at home, or withdrawing into himself while at school.  His cutting behavior and suicidal ideations continued into his high school years.  He had obvious problems expressing anger appropriately.  He was self-contained and did not seek help in taking care of his needs.  His special services teacher reported that he had several obvious to very serious problems handling frustration, asserting emotional needs, and using good judgment regarding personal safety and dangerous circumstances.  He continued in his crying and withdrawing strategies to cope with stress.  He was reluctant to take medications because of their adverse effects, and he resisted psychotherapy because of his past behaviors.  Several providers reported that Lillard did not fully understand the nature and effect of his psychological impairments.

In Social Security Ruling 09-7P, *Title XVI:  Determining Childhood Disability—the Functional Equivalence Domain of "Caring for Yourself,"* 2009

WL 396029 (S.S.A. Feb. 17, 2009), the Social Security Administration recognized

that "children whose mental or physical impairments affect the ability to regulate

their emotional well-being may respond in inappropriate ways," such as:

- A child with an anxiety disorder may use denial or escape rather than problem-solving skills to deal with a stressful situation.
  . . .
- A teenager with a depressive disorder may have adequate hygiene, but seek emotional comfort by engaging in self-injurious behaviors (for example, binge eating, substance abuse, or suicidal gestures).
- A child with a traumatic brain injury who has poor impulse control may have problems managing anger.

*Id.* at *3. Because of his mental and physical impairments, Lillard repeatedly

engaged in these and several other limiting behaviors during his adolescence, even

when contained in a highly structured and supportive environment. Medications

taken to alleviate these behaviors offered only limited and intermittent relief while

exacerbating the effects of his brain injury, and ultimately caused significant and

potentially life-threatening side effects. *See Wigfall*, 244 F. Supp. 3d at 968 (ALJ

substantially erred when he refused to consider debilitating side effects from

medication). Lillard experienced serious limitations in his activities and day-to-

day functioning because of the interactive effects of his impairments and

medications. This overwhelming evidence shows that Lillard had marked

limitations in the domain of Caring for Yourself. *See* 20 C.F.R. §

416.926a(e)(2)(i) (definition of "marked").

Accordingly, because Lillard had marked limitations in two domains of

functioning – Interacting and Relating with Others, and Caring for Yourself – his impairments functionally equaled the Listings, and he is entitled to child disability benefits from the alleged onset date, that is, November 17, 2010.

2.    *Adult Disability*

In determining Lillard's RFC as an adult, the ALJ accorded great weight to Dr. Khushalani's June 2016 responses to medical interrogatories as well as his February 2017 hearing testimony.  For the reasons set out above, the ALJ erred by according any weight to Dr. Khushalani's opinions.

The ALJ accorded limited weight to Dr. Spalding's January 2017 Mental Medical Source Statement, finding that the opined marked-to-extreme limitations were inconsistent with treatment records that showed near-normal mental status examinations and with Lillard's own statements that his condition had improved with therapy.  (Tr. 688.)  As noted earlier, however, the ALJ failed to consider the waxing and waning nature of Lillard's mental illness, focused only on a limited period of improvement, and ignored evidence of worsening symptoms.  *See Andler*, 100 F.3d at 1393.  She also failed to consider the extent to which Lillard's symptoms may have been controlled or attenuated by his structured and supportive environment.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D).  For reasons discussed throughout this memorandum, the record does not provide a basis for rejecting the opinion of Dr. Spalding, Lillard's treating psychiatrist.  *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (opinion of treating physician

accorded special deference under regulations and is "normally entitled to great weight.").

I have carefully reviewed all the evidence of record. Lillard suffers from mental impairments for which he does not – and reasonably feels he cannot – take psychotropic medications to control symptoms, given the adverse effects of previous medications, including increased suicidal ideation, a sense that things are not "real," and exacerbation of dizziness associated with his brain injury. Psychotherapy provides some relief, albeit within the structured and supportive setting of Lillard's life, *i.e.,* regular supervision by a caseworker, being accompanied in the community by family or his caseworker, and reliance on family and/or his caseworker for assistance in daily living. Nightmares prevent regular sleep. The longitudinal picture shows Lillard to experience limited periods of improvement with eventual relapse. There is simply no evidence in the record that Lillard can work on a sustained basis.

Accordingly, because the combined effect of Lillard's severe mental and physical impairments prevents him from engaging in any meaningful and gainful employment, he is entitled to disability benefits as an adult. *See Pate-Fires*, 564 F.3d at 947.

## Conclusion

There is no reason to further prolong this case. Lillard applied for benefits at age twelve. In three months, he will be twenty-two years of age. In the interim,

his claim has gone through the administrative process twice, with the Commissioner committing several egregious, reversible errors on both occasions. I will not remand the matter for the Commissioner to make a third attempt at getting it right.

For the reasons set out in this memorandum, the clear weight of the evidence fully supports a determination that Lillard was disabled as a child and is disabled as an adult within the meaning of the Social Security Act. Because the record overwhelmingly supports a finding of disability, reversal and remand for an immediate award of benefits is appropriate. *Pate-Fires*, 564 F.3d at 947 (citing *Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997); *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984)).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Commissioner for calculation and award of benefits with a disability onset date of November 17, 2010.

An appropriate Judgment is entered herewith.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 25th day of March, 2019.